AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| The Person of A█████ W█████, DOB: 1██/1989, | ) |
| SSN: █████, Including Any Bags or Objects | ) |
| Closely Associated with Him | ) |

Case No.   1:21-mj-174

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC §§ 922(g)(1);1512(c)(2));1503; 371 and 1503; 1512(b)(2); 1512(k); 1623(a) | Felon in possession of firearm or ammunition; Witness tampering; Obstruction of justice; Conspiracy to commit obstruction of justice; Witness tampering; Conspiracy to commit witness tampering; Perjury |

The application is based on these facts:

See attached affidavit of ATF Special Agent Edward Schaub.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Edward Schaub, Special Agent, ATF
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

__via FaceTime video_____ *(specify*

Date: **Feb 24, 2021**

_____
Karen L. Litkovitz
United States Magistrate Judge

City and state:   Cincinnati, Ohio

**ATTACHMENT A**

*Premises to be searched*

The premises to be searched is the person of A██████ W███████, further described as a Black male born on ██████ 1989, with Social Security Number █████████ The premises to be searched also includes any clothing W██████ is wearing at the time of the search, as well as any bags or containers on W██████s person or within his reach at the time of the search.

This warrant authorizes a search of W██████ only within the Southern District of Ohio.

## ATTACHMENT B

*Property to be seized*

All records relating to violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm or ammunition); 18 U.S.C. § 1623(a) (perjury); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. §§ 371 and 1503 (conspiracy to commit obstruction of justice); 18 U.S.C. § 1512(b)(2) (witness tampering); 18 U.S.C. § 1512(c)(2) (witness tampering); and 18 U.S.C. § 1512(k) (conspiracy to commit witness tampering), those violations involving Darias JACKSON, Jessica BROWN, Gregory JACKSON, Jearid IRVIN, and other conspirators and occurring on or about September 19, 2019, through the present, specifically:

    a.   All communications and records, in whatever form they may be—whether they are paper communications such as letters, audio recordings, electronic communications, or otherwise:

        i.   that contain evidence of Darias JACKSON, Jessica BROWN, Gregory JACKSON, and/or Jearid IRVIN endeavoring to influence, obstruct, evade, impede, or otherwise interfere with the investigation into Darias JACKSON's role in the shooting of A█████ W████████ on September 19, 2019;

        ii.   that contain evidence of Darias JACKSON, Jessica BROWN, Gregory JACKSON, and/or Jearid IRVIN engaged in a conspiracy to pay, influence, persuade, bribe, threaten, or otherwise communicate with

A████ W██████ for the purpose of getting A████ W██████ to recant his identification of JACKSON as the person who shot him on September 19, 2019, or to otherwise not cooperate in criminal prosecutions and investigations;

iii. relating to the shooting of A████ W██████ on or about September 19, 2019, near Groesbeck Road in Cincinnati, Ohio, including any communications relating to the incident;

iv. relating to the possession of a firearm and ammunition by Darias JACKSON;

v. relating to communications between A████ W██████ and Darias JACKSON, including, but not limited to, communications related to the September 19, 2019 shooting of A████ W██████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A████ W██████ and possessing firearms and/or ammunition;

vi. relating to communications between A████ W██████ and Jearid IRVIN, including, but not limited to, communications related to the September 19, 2019 shooting of A████ W██████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias

JACKSON's role in the shooting of A█████ W███████ and possessing firearms and/or ammunition;

vii. relating to communications between A█████ W███████ and Gregory JACKSON, including, but not limited to, communications related to the September 19, 2019 shooting of A█████ W███████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A█████ W███████ and possessing firearms and/or ammunition;

viii. relating to communications between A█████ W███████ and Jessica BROWN, including, but not limited to, communications related to the September 19, 2019 shooting of A█████ W████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A█████ W███████ and possessing firearms and/or ammunition;

ix. relating to communications to or from A█████ W███████ and other third parties related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A█████ W███████ and possessing firearms and/or ammunition;

x. regarding money used to facilitate a payoff to A█████ W███████;

3

b. U.S. currency ($1,000.00 or more) that is indicative of proceeds from the payoff in exchange for W████████'s recantation.

c. All cellphones, mobile phones, smartphones, and tablets (such as iPads) belonging to or used by A█████ W████████ (hereafter, any "Phone"), including but not limited to the Phones assigned call numbers ██████-5741 and █████ 5005;

d. For any computer or storage medium, including any cell phones and tablets, whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    i. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    ii. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii. evidence of the lack of such malicious software;

4

  iv. evidence indicating how and when the computer was accessed or used to

    determine the chronological context of computer access, use, and events

    relating to crime under investigation and to the computer user;

  v. evidence indicating the computer user's state of mind as it relates to the

    crime under investigation;

  vi. evidence of the attachment to the COMPUTER of other storage devices or

    similar containers for electronic evidence;

  vii. evidence of counter-forensic programs (and associated data) that are

    designed to eliminate data from the COMPUTER;

  viii. evidence of the times the COMPUTER was used;

  ix. passwords, encryption keys, and other access devices that may be

    necessary to access the COMPUTER;

  x. documentation and manuals that may be necessary to access the

    COMPUTER or to conduct a forensic examination of the COMPUTER;

  xi. records of or information about Internet Protocol addresses used by the

    COMPUTER;

  xii. records of or information about the COMPUTER's Internet activity,

    including firewall logs, caches, browser history and cookies,

"bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xiii.  contextual information necessary to understand the evidence described in this attachment.

6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: **THE PERSON OF A    W    ,** **DOB: 11/XX/1989, SSN: XXX-XX-3516, INCLUDING ANY BAGS OR OBJECTS CLOSELY ASSOCIATED WITH HIS PERSON** | Case No.    1:21-mj-174 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Edward Schaub, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the person known as A  W  , DOB: 11/XX/1989, SSN: XXX-XX-3516,[1] including any bags or objects closely associated with his person,  hereinafter "W  ," further described in Attachment A, for the things described in Attachment B.

2.      I have been employed with the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) as a Special Agent since September of 2014 and am currently assigned to the ATF Organized Crime Squad.  I am a graduate of the Criminal Investigator Training Program and Special Agent Basic Training in Glynco, Georgia.  Prior to becoming a Special Agent, I was a Hopkinsville

---

[1] I know W  's full date of birth and Social Security Number, which are redacted to protect his personally identifying information.

Kentucky Police Officer for eight years and was an ATF Task Force Officer assigned to the Western Kentucky Gun Crimes Task Force in Christian County, Kentucky. I am a graduate of the Department of Criminal Justice Training Center in Richmond, Kentucky. During my employment with ATF, I have been involved in numerous investigations of violations of federal and state criminal laws resulting in multiple successful prosecutions. My investigations have included analysis of evidence retrieved from computers, cell phones, and other electronic devices.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

A.      **ATF and the U.S. Attorney's Office are investigating a shooting that occurred in September 2019, as well as attempts to obstruct that investigation by Jessica BROWN, Jearid IRVIN, Gregory JACKSON, and others.**

4.      As I describe in more detail below, ATF and the U.S. Attorney's Office for the Southern District of Ohio are investigating a shooting that occurred in the early morning hours of September 19, 2019. Based on the investigation to date, I believe that Darias JACKSON ("JACKSON") was the shooter. I also believe that, after the shooting, JACKSON and his girlfriend, Jessica BROWN, and JACKSON's brothers Gregory JACKSON ("G. JACKSON") and Jearid IRVIN, along with other unknown individuals, conspired to obstruct the government's investigation into the shooting, including by conspiring to pay the shooting victim (W███████) to recant his identification of JACKSON as the shooter. I believe that G. JACKSON and IRVIN helped obtain W███████'s recantation by bringing a

2

typewritten affidavit to W███████'s hospital room, which was part of the plot to thwart the criminal prosecution against JACKSON. I further believe IRVIN and his coconspirators' attempts to obstruct the government's investigation are ongoing.

**B.      On September 19, 2019, W███████ was shot several times in the parking lot outside an apartment on Groesbeck Road in Cincinnati.**

5.      At approximately 3:09 am on September 19, 2019, a 911 caller reported that a victim (later identified as W███████) had been shot near an address on Groesbeck Road in Cincinnati, Ohio. While officers were on their way, they received reports that someone had recently arrived at the hospital suffering from multiple gunshot wounds.

6.      Officers located nine 9 mm casings and blood in the parking lot in front of the apartment on Groesbeck Road.  The ammunition associated with these casings was manufactured outside the State of Ohio. Officers never located the firearm used to shoot W███████.

7.      Shortly after his arrival at the hospital, W███████ was taken into surgery and was unable to provide any statements to officers for several days.

**C.      On October 2, 2019, W███████ identified JACKSON as the shooter.**

8.      On October 2, 2019, when shown a 6-pack of photographs, W███████ identified Darias JACKSON as the shooter and said he had known JACKSON for many years.

9.      At the time of the shooting on September 19, 2019, JACKSON was on federal supervised release in connection with his 2013 conviction for Conspiracy to Possess with Intent to Distribute 1,000 Kilograms or More of Marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A), a Class A

3

felony punishable by more than one year in prison.  JACKSON was sentenced to 50 months'
imprisonment for that offense.

    **D.**    **On October 31, 2019, two men, including JACKSON's brother JEARID IRVIN,
brought a typewritten affidavit to W███████ in which W███████ recanted his
previous identification of JACKSON as the shooter.**

    10.    On October 31, 2019, a notary public for the hospital where W███████ was being
treated was called to W███████'s room to notarize a statement in which he/she recanted his/her
identification of JACKSON as the shooter.

    11.    Upon entering, the notary saw six people in the room: W███████, who was sitting in
his bed with his legs dangling over the side; three individuals on a love seat who the notary believed
were likely W███████'s parents and a sibling; and two males whom she did not now in the back of the
room.  The notary stated that the two men in the back of the room brought the typewritten affidavit to
her.  W███████ told the notary that he had read the affidavit.  The notary then asked three questions to
determine whether W███████ was competent to sign the affidavit ("Who is the president of the United
States?"  "Where are you?" and "What is today's date?").  After receiving satisfactory responses, the
notary reviewed the affidavit with W███████ and noted to him that it appeared W███████ was
recanting a previous statement.  W███████ responded that he was recanting because the person
W███████ had accused was W███████'s cousin and it was the first name he had thought of after the
shooting and that was why he said the name originally.  According to the notary, W███████ stated,
"He's my boy; it was not him."  When one of the individuals the notary believed were W███████'s

4

parents asked what W█████ was signing, W█████ responded that it was just paperwork for the hospital.

12.     W█████ signed the affidavit, and the notary notarized it. As soon as the document was notarized, the two men in the back of the room stepped forward, took the signed statement, and walked out of the room.

13.     Later, as the investigation into the shooting and subsequent obstruction continued, law enforcement learned from a confidential witness, CW-1,[2] that W█████ had told him/her that one of the two men who provided the affidavit to W█████ in the hospital was JACKSON's brother Jearid IRVIN. CW-1 was not sure who the second man was; however, based on the evidence I describe below, I believe the second individual was likely JACKSON's brother G. JACKSON.

**E.     On January 8, 2020, W█████ reaffirmed that JACKSON was the shooter.**

14.     In a telephone interview on January 8, 2020, W█████ again identified JACKSON as the shooter, saying that he/she had been on a substantial amount of pain medicine when he/she signed the affidavit on October 31, 2019.

---

[2] CW-1 was convicted of drug trafficking once in the mid-1990s and again in the early 2010s. Apart from these felony convictions, CW-1 has a couple of misdemeanor convictions that are more than a decade old. None of his/her criminal history involves crimes of dishonesty.

F.     **A video taken moments before the shooting appears to show W██████ and JACKSON in an aggressive verbal confrontation.**

15.    After the shooting, but before W██████ was medically stable and could be interviewed, law enforcement received anonymous tips that someone had taken video of a confrontation between W██████ and JACKSON shortly before the shooting.

16.    Law enforcement later obtained a copy of the video, which shows two individuals who strongly resemble W██████ and JACKSON in an aggressive verbal confrontation.  The two individuals appear to be standing in the parking lot outside the Island Breeze Apartments on Groesbeck Road, near where W██████ was shot.

17.    The video's metadata show that the video was taken at 3:06 am—approximately three minutes before the 911 call reporting that W██████ had been shot.  The video also partially shows a vehicle that is consistent in appearance with a vehicle registered to JACKSON; the person who appears to be JACKSON is sitting on that vehicle in parts of the video.  Because the video appears to have been taken from inside an apartment, while the two individuals were outside in the parking lot, the individuals' words cannot be clearly heard.

G.     **Jail calls revealed that JACKSON instructed BROWN to testify falsely when BROWN was subpoenaed to testify before the grand jury.**

18.    On July 7, 2020, I called JACKSON's girlfriend, BROWN, and left a message asking her to call me back so that I could arrange to serve her with a subpoena for her testimony at a federal grand jury proceeding.

19.     That afternoon, before BROWN returned my call, BROWN first spoke to JACKSON on a recorded jail call that JACKSON placed to BROWN's personal cell phone ending in 5859 (the "5859 Phone"). In this call, JACKSON instructed BROWN to call me (Agent Schaub) back "right now" and said that she did not need to comply with a subpoena. They arranged for JACKSON to call JACKSON's personal cell phone ending in 5587 (the "5587 Phone"), which was in BROWN's possession, so that BROWN would be on the phone with JACKSON and me simultaneously, but using two different cell phones. In other words, BROWN had both her personal phone, the 5859 Phone, and JACKSON's personal phone, the 5587 Phone, at the time she returned my call. BROWN used her personal phone to return my call, but first arranged for JACKSON to call the 5587 Phone so she would be on the phone with JACKSON for the entirety of her call with me.

20.     Jail call records reflect that after calling BROWN on the 5859 Phone (i.e., after the call on which they discussed the plan for BROWN to call me back), JACKSON hung up and immediately called the 5887 Phone (which, again, was in BROWN's possession) as planned. While BROWN was speaking to JACKSON using the 5887 Phone, BROWN simultaneously called me from her phone, the 5859 Phone. I believe BROWN placed my call with her on speakerphone so that JACKSON could hear what we were saying because in the recorded audio from the 5587 Phone call I can hear my voice as I am speaking to BROWN.

21.     JACKSON and BROWN spoke several times in the twenty-four hours immediately preceding her grand jury testimony, which occurred on July 8, 2020. Over the course of these phone calls JACKSON made numerous statements instructing BROWN not to comply with the subpoena,

7

including telling her what answers to give to the prosecutors conducting the questioning and telling her to withhold information. BROWN acknowledged JACKSON's instructions and agreed with his proposal.

22. Within hours of BROWN's grand jury testimony, an inmate at the jail called her "for DJ" to "make sure you are alright" and to see "how did everything go." BROWN indicated that everything was fine. Later that night, when she and JACKSON spoke on the phone in another recorded jail call, she repeated the questions asked of her and told JACKSON what her answers were. She said that she did not have to "plead the Fifth" because "they were asking stupid [expletive]" and nothing about the questioning stood out apart from a question about a telephone call she made to JACKSON the night of the shooting.

23. I know, based on my review of dozens of recorded jail calls between JACKSON and BROWN, that JACKSON and BROWN frequently discuss the pending investigation and prosecution against JACKSON. I also know, based on my review of dozens of recorded jail calls between JACKSON and BROWN, that JACKSON has instructed BROWN to place various phone calls to other individuals using his cell phones, and BROWN has complied. I also know that they often speak in ways that are consistent with purposefully vague and coded language designed to thwart law enforcement from being alerted to their true topic of conversation. For example, I know in one recorded jail call from October 2019, in which JACKSON called BROWN on BROWN's personal phone, JACKSON instructed BROWN to use one of his cell phones to place a call to a third party. BROWN placed the call using JACKSON's cell phone and no one answered, but shortly thereafter BROWN received a call back

8

on JACKSON's cell phone from that third party. After BROWN answered and then ended the call she had just received on JACKSON's cell phone, JACKSON asked her, "You know what he's talking about, don't you?" BROWN responded, "Yeah, I got you." Some of this portion of their exchange is unintelligible, but BROWN appeared to reassure JACKSON that she had "repeated" JACKSON's statements to the caller. Then JACKSON told BROWN that "the DVDs" are "three dollars" each, "you know what I mean?" But if someone wants to "rent DVDs," that's "two dollars a day," or "at least a dollar ninety cent, you know what I mean?" JACKSON verified that BROWN had "heard" him, and BROWN responded in the affirmative. Jackson repeated the pricing he had just described, then continued, "But if he's trying to buy the whole DVD with all the episodes on it, he can just give you— he can just give you three dollars." JACKSON repeated this pricing information several times and got confirmation that BROWN understood. Based on my training and experience, and my knowledge of JACKSON and the investigation thus far, I do not believe that DVDs are the true subject of their conversation. Therefore, I believe that JACKSON and BROWN are cognizant of the fact that these calls are monitored and make efforts to disguise their meaning.

24. Based on my training and experience, and based on my review of JACKSON's recorded jail calls and my meetings with BROWN, I believe that JACKSON instructed BROWN not to testify fully and completely in order to frustrate the grand jury's investigation. I also believe that JACKSON and BROWN are aware that their jail calls are recorded and speak in coded language during those calls.

9

**H. A search warrant for two phones seized from BROWN in October 2020 revealed evidence of a scheme in which G. JACKSON paid W███████ to recant his identification of JACKSON.**

25. In October 2020, BROWN was arrested. Incident to her arrest, agents located two Apple iPhones. On October 28, 2020, in Case No. 1:20-MJ-00779, the Honorable Karen Litkovitz, U.S. Magistrate Judge, signed a search warrant authorizing the search of these two phones.

26. One of the two Apple iPhones is BROWN's personal cell phone, with call number ending in 5895. My review of the forensic analysis of this phone revealed multiple text messages between BROWN and an individual using phone number 513-858-5005. I believe that the individual using the 513-835-5005 phone is W███████, because the contact is listed in BROWN's phone as "[Victim's nickname] {for DJ}", and because the content of the messages leads me to believe that the two are discussing a scheme in which JACKSON and a coconspirator paid W███████ to recant his statement incriminating JACKSON. For example, the following are text messages exchanged between BROWN and W███████ on October 10, 2020:

| W███████: | Cuz when my cousin call tomorrow tell him I was suppose to meet with bruh n den meet that lady but bruh switched up wat he saying or sum [unidentified emoji] tell em it ain't nun doe |
|---|---|
| **BROWN:** | Switched up what? |
| W███████: | Just a misunderstanding about everything I guess I'll call g later n see what's up ….. but look doe I sent bruh dis [Attachment below] |

10



W███████:         Like bruh I already did wat I was suppose to hit his charges dismissed regardless of who ever else said different I said thst n he beat that case this fed shit is new to me … but I still a look out for bruh befor he be doing a zillion years or a accident ….. but not if a mf tryna play me again Jessica it don't make sense when. I can just be silent like I've been this whole time that [JACKSON's defense attorney][3] lady said that would help him doe a lot.

W███████:         G told me I'll get str8 once I walk n the courtroom like that shit just sound like some perpin shit but the funny par is im willing to speak on cuz behalf

W███████:         I'll go speak on his behalf on the strength fucc the money I thought bruh was looking out on the strength of his mistake Jessica I'm fucced up surgeries n shit allat …. N fr dat was my mf brother bruh like this nothing never pose to cane between us I know that nugga heart man he salt asf 2 tell em I still love em tf

BROWN:         Ima call you n a min

27.      I believe, based on my training and experience, and my knowledge of the investigation to date, that in the above text messages, when W███████ said, "I already did wat I was suppose to hit his charges dismissed," he meant that he had helped get JACKSON's state charges dismissed by signing an affidavit recanting his identification of JACKSON as the shooter and then failing to appear to trial.

28.      I also believe that the attachment W███████ sent to BROWN, depicted above, is a screenshot of an iPhone conversation between W███████ and G. JACKSON, JACKSON's brother. The contact is identified as "Greg Jizzle"; "Greg" is G. JACKSON's first name, and "Jizzle" is a

---

[3] As described in more detail below, W██████ uses a misspelling of the first name of one of JACKSON's defense attorneys of record. Based on other text messages and voicemails left by this defense attorney on BROWN's phone, as well as other communications between BROWN and W██████, the context leads me to believe that W███████ is referring to JACKSON's defense attorney, and not another individual with the same first name.

12

nickname for JACKSON.[4] I believe that W⬛⬛⬛ sent this screenshot of his conversation with G. JACKSON to BROWN to demonstrate that W⬛⬛⬛ was owed money in exchange for not cooperating in the prosecution against JACKSON. W⬛⬛⬛ also included a photograph of the state court charges against JACKSON for the September 19, 2019 shooting to further underscore that the payoff was in reference to getting JACKSON's charges dismissed.

      29.     I also believe that, when W⬛⬛⬛ said, "I can just be silent like I've been this whole time[.] [T]hat [JACKSON's defense attorney] lady said that would help him doe a lot," he meant that one of JACKSON's attorneys of record had told him—or at least he had understood from the conversation—that remaining silent would help JACKSON. I believe that the person he references, whose name I have redacted in this affidavit, is one of JACKSON's attorneys of record, because (1) the redacted name is a misspelling of the first name of one of JACKSON's attorneys; and (2) my review of BROWN's phone also revealed multiple text messages and voicemails from this attorney in which the attorney repeatedly asks BROWN to facilitate a meeting between JACKSON's lawyers and W⬛⬛⬛. I also reviewed other text messages between BROWN and W⬛⬛⬛ about W⬛⬛⬛ meeting with defense counsel. In one message to BROWN, W⬛⬛⬛ says he spoke to the attorney I referenced above.

---

[4] The alias "Jizzle" is included in a 2013 federal indictment against Darias JACKSON.

30.     W███████ and BROWN also communicated via text message on October 20, 2020. These messages include the following exchange:

**W███████:**     G ask how much I told em 8 jizzle already gave me 7 last year … I guess he ain't tryna do that for bruh or it just everything n me telling me like cuz tryna spend u like last time … I don't get it

**BROWN:**     Sheesh I ain't know anything about 8

**W███████:**     7 plus 8 that's 15 cuz coulda gave me close to that doe I'm tryna get my living shit together

**W███████:**     It was 15 from jump doe

**W███████:**     Half now half later was da agreement

**W███████:**     Brought me 7 said it was 7500 but it was 7

31.     As noted above, I know from prior investigations of JACKSON that "Jizzle" is one of his nicknames. I believe, based on my training and experience and my knowledge of the investigation to date, that in the above text messages W███████ was describing being paid money by JACKSON in exchange for helping JACKSON evade criminal prosecution. Specifically, when W███████ said, "G ask how much I told em 8 jizzle already gave me 7 last year," and then "7 plus 8 that's 15 cuz coulda gave me close to dat doe," I believe he meant that the agreement was for $15,000.00, with half paid to W███████ up front and half later. I believe that W███████ was telling BROWN that he was still owed $8,000.00, which reflects that "jizzle" (JACKSON) had already paid W███████ $7,000.00. I further believe (based on the screenshot above, showing the conversation with "Greg Jizzle") that "G" is a reference to G. JACKSON, and that in the above exchange W███████ was explaining to BROWN

14

that W█████ had been in touch with G. JACKSON regarding the $8,000.00 W█████ was still owed.

32.     I also believe that, when W█████ said, "Just a misunderstanding about everything I guess I'll call g later n see what's up," he meant that he would call a third party—whom he referred to as "g"—about the scheme to pay W█████ to recant his identification of JACKSON. As explained above, I believe "g" refers to G. JACKSON.

33.     In another message, W█████ exchanged the following texts with BROWN:

**W█████:**          Wasup with cuz u talk to him … got surgery coming up

**W█████:**          Is they gone let him out

**BROWN:**          Waiting on him to call. When is your surgery?

**BROWN:**          Idk if they letting him out they waiting to hear from you I guess

**W█████:**          Yea they should let him out for usre after I talk to her my surgery n 2 weeks….

**W█████:**          Why they ain't let him out when I sign that paper n got his charges dismissed

                         [. . . .]

**BROWN:**          Feds picked up the case, on the other end it's all good

**W█████:**          Ok Shiid can we do that the same day we go see that lady u can take me or wateva or meet me or she a come to us at dee dee hz

34.     Based on my training and experience and knowledge of this case, including the context of these messages, I believe that when W█████ said, "can we do that the same day we go see that

15

lady," he was referring to a joint meeting between W█████, BROWN, and JACKSON's attorney of record. I further believe that when W█████ said, "u can take me or wateva or meet me or she a come to us," he meant that BROWN could take him to the meeting with JACKSON's counsel.

> **I. Jail calls from October 2019 through November 2019 recorded JACKSON communicating with G. JACKSON, IRVIN, and BROWN about the plot to pay W█████ money in exchange for W█████ signing the affidavit recanting his identification of JACKSON as the shooter.**

35.    JACKSON has been in custody since October 4, 2019, and throughout his incarceration he has made hundreds of jail calls using his assigned inmate PIN. However, a review of BROWN's cell phone records revealed that BROWN received multiple phone calls from the jail in October and November 2019 that were not recorded under JACKSON's pin. My review of jail records revealed that JACKSON used at least five other inmates' PINs to speak to BROWN, G. JACKSON, IRVIN, and JACKSON's mother.[5] These calls, which are excerpted below, were recorded. I believe JACKSON placed these calls using other inmates' PINs so that he could speak more freely with his co-conspirators, believing that these calls would not come to investigators' attention. These calls contain additional evidence of the plot to thwart the criminal prosecution of JACKSON.

---

[5] I believe that the phone number 513-481-1960 belongs to JACKSON's mom, and that is a landline phone number. This number is saved in BROWN's phone as "Dj hz," which I believe stands for "DJ's House." A woman JACKSON calls "mom" answers the phone when JACKSON calls this number in the recorded jail calls.

36.     In one call JACKSON placed three days before the affidavit was signed, I believe

JACKSON and BROWN discussed JACKSON's brothers G. JACKSON (GREG) and IRVIN obtaining

W██████'s affidavit from JACKSON's defense attorney's[6] office:[7]

| Date | Dialed # | Content |
|------|----------|---------|
| 10/28/19<br>11:14<br>a.m. | 513-212-5895<br><br>(BROWN) | **BROWN:** Your brother says [U/I] have questions [U/I]<br><br>**JACKSON:** You seen my brother?<br><br>**BROWN:** Uh huh.<br><br>**JACKSON:** Where you was at, my mama's house?<br><br>**BROWN:** Uh huh.<br><br>**JACKSON:** Aight. I wish I woulda caught it [U/I] . . . Did he tell you anything?<br><br>**BROWN:** He was waiting on her.<br><br>**JACKSON:** Who, [JACKSON's defense attorney]?<br><br>**BROWN:** Mm hmm.<br><br>**JACKSON:** I mean, what you mean by that, though? I thought they said it was going to be there at the front desk.<br><br>**BROWN:** Shit, I don't know. I guess she [U/I] help typing it up. I don't know. [U/I] Greg [U/I] talking to Greg. [U/I]<br><br>. . . .<br><br>**JACKSON:** Gonna call my brother, though, probably about 2.<br><br>**BROWN:** I haven't talked to Greg yet. |

---

[6] The conspirators used an abbreviation of JACKSON's defense attorney's name, by which the defense attorney was also known professionally.

[7] The transcriptions of these jail calls are not precisely verbatim, but capture the essential substance of the calls.

**JACKSON:** Huh?

**BROWN:** I said I haven't talked to Greg yet.

**JACKSON:** Ain't that who you said was at the house?

**BROWN:** No, I said Jearid. That's what I said. Um when you asked me, I said I hadn't talked to Greg. [U/I] easier to talk to.

**JACKSON:** Yeah, that's what I'm saying. You should have told him, why he waiting on her and the paper on her desk already? It's waiting on him.

**BROWN:** Yeah, so she already knew he was going up there. He said I know that part.

**JACKSON:** Yeah, see, mothafuckas is movin' on their own time. Would you tell my brother to call him and go get that paper?

**BROWN:** Yeah.

**JACKSON:** What the fuck. Mothafuckers procrastinating. That shoulda been first priority, man. After the kids get to school and all that, that shoulda been first priority.

**BROWN:** Mm hm.

**JACKSON:** Especially when -- how one motherfucker know they supposed to be going this way, other one knows they supposed to be going this way, when y'all gonna meet in the middle and get it done?

**BROWN:** Right.

**JACKSON:** That's what I be saying, man. He telling he waiting on [JACKSON's defense attorney]. When [JACKSON's defense attorney] already done told my brother that the paper at her desk.

**BROWN:** Lack of communication.

**JACKSON:** Yeah, that's what I'm saying, though. But you knew that too, though. You shoulda been like why are you waiting on her? The paper there, waiting on you.

18

| | | **BROWN:** Right, I'm just like, um, I know for a fact he's doing nothing. He's like yeah [U/I] I don't know. I'm a call Greg. Greg already [U/I] talked to [U/I] |
|---|---|---|
| | | **JACKSON:** You said what? |
| | | **BROWN:** Greg done probably already talked to her and everything. |
| | | **JACKSON:** See you ain't hearing nothing I been saying. That's what I be saying about comprehension. What is there to talk about? When she talked to him on the 25th – |
| | | **BROWN:** Ok, I'ma call Greg. |
| | | **JACKSON:** No, I'm saying, when she talked to him on the 25th, when [JACKSON's defense attorney] got on the phone, she said the paper would be available to pick up at her office Monday morning. |
| | | **BROWN**: OK. So he shoulda picked it up to have it signed already. |
| | | **JACKSON:** Meaning, yeah, somebody should have picked it up. Not talked to her again on Monday to see what's going on. Mothafuckers talked to her last week to know what's going on. [ . . . ] Tell him I said I'll call him about 1:30 or something. |

37.      Later that day, JACKSON and BROWN spoke again.[8] I believe, based on the context of other calls discussed below, that on this call JACKSON told BROWN to meet with GREG so that the two could coordinate getting money for the payoff to W⬛⬛⬛⬛:

---

[8] This particular call was placed under JACKSON's assigned PIN.

19

| Date | Dialed # | Content |
|---|---|---|
| 10/28/19<br><br>4:04<br>p.m. | 513-212-5895<br><br>(BROWN) | **JACKSON:** Get with my brother… get with my brother and give him something… I guess he'll tell you what it is… but give him something, and uh…<br><br>**BROWN:** Yeah he has [U/I]<br><br>**JACKSON:** I just, I just told him, uh… I just told him, uh… I just told him, what, what to get, what to uh, what to get from you, so, just call him, and uh, give it to him, but you remember what you, remember what you came… uh…. showed me…<br><br>. . . .<br><br>**JACKSON:** All right, well call my brother and see what he talking about… and give it to him<br><br>**BROWN**: I'm already [U/I]… we about to run downtown so that's the first thing [U/I] |

38.     Two days later, JACKSON called his mother using another inmate's PIN, and after about six minutes, his mother said, "Here your brother. Here, Greg." A man I believe is JACKSON's brother G. JACKSON then got on the phone, and the two appeared to discuss the scheme to get the affidavit and to pay off W██████. A third male, who I believe based on context is IRVIN, called G. JACKSON (GREG) on speaker phone during the call, and the three then discussed how IRVIN was going to pick up the affidavit from JACKSON's defense attorney's office at 11 a.m.:

| Date | Dialed # | Content |
|---|---|---|
| 10/30/19<br><br>10:31 a.m. | 513-481-1960<br><br>(JACKSON'S mom) | **GREG:** I called [JACKSON's defense attorney] yesterday saying return my call, then I called, uh, I mean I texted this morning, I ain't got no response, but you know I was talking to brother and he like, nah, we can't let him do that like, he gotta, you know, he gotta take that chance, you know what I'm saying<br><br>**JACKSON:** Yeah<br><br>**GREG:** You know<br><br>**JACKSON:** Yeah, I was thinking the same thing, even if, it's a better chance, you know what I mean<br><br>**GREG:** Yeah, yeah, he was saying if you still have to wait, at least you're waiting with the right documents now<br><br>**JACKSON:** Yeah, I was thinking the same thing, yeah, I was thinking the same thing, yep<br><br>**GREG:** You know<br><br>**JACKSON:** Yeah<br><br>**GREG:** Yeah, how he was explaining the situation like it's already done now but, if it can get better, and he still gotta wait, at least it's better<br><br>**JACKSON:** Right<br><br>**GREG:** You know what I mean<br><br>**JACKSON:** Well, you gotta go down to her office<br><br>**GREG:** Yeah, yep<br><br>**JACKSON:** OK<br><br>**GREG:** Yeah I'm just gonna go ahead and go down that because I don't know if Jearid gotta wait on Crystal to do something, but it's not even 11 yet |

**JACKSON:** You know the notaries been getting out of places early you know what I'm saying

**GREG:** Not at the hospital, they have a whole section of notaries up there

**JACKSON:** Damn I really need that, um yeah, make sure that's in the in the uh, I don't know, make sure he doing it, make sure it's his it's his handwriting and all that, you know what I mean?

**GREG:** Yeah. Yeah.

**JACKSON:** And uh, and that uh, and on the handoff part, make sure that's in the blind spot or nothing, you know what I'm saying?

**GREG:** Absolutely

**JACKSON:** Down on the ground or something, and it's right there right there, I ain't gave you nothing.

**JACKSON:** Yeah, yeah, I already thought that -- Like --

**GREG:** That was that was his people going to be doing that

**JACKSON:** Yeah, but I'm just saying make sure, like –

**GREG [to IRVIN]:** I'm on the phone with brother right now. What time can we go down there?

**IRVIN**: 11?

**GREG [to IRVIN]:** You going down there at 11?

**IVRIN**: Yep.  Hey brother?

**JACKSON:** Yeah?

**IRVIN**: Hey brother, we gotta go and just go get it --

**GREG:** Hey, we already talked about it –

**JACKSON**: I know, I know. That's what I was calling for.

**GREG:** Yeah, we already talked about that.

22

| | | **IRVIN**: I'm going down there at 11 so by 12 I should be at mama's house. |
| | | . . . . |
| | | **JACKSON:** That's what I was calling, to make sure that's in the blind spot and all that, you know what I mean? |
| | | . . . . |
| | | **JACKSON:** Whatever, uh, whatever Jessica got, like, uh, shit, man…like, leave, uh, like leave out a couple bands or something. Just give the rest to cuz. |
| | | **GREG:** The whole thing was like knowing the situation without knowing anything I was just trying to handle the situation |
| | | . . . . |

39.     I believe that when JACKSON said, "On the handoff part, make sure that's in the blind spot or nothing, you know what I'm saying?  . . . Down on the ground or something, and it's right there right there, I ain't gave you nothing," the "handoff" he was referring to was the first of the two payments to W██████, and, by "blind spot," he meant an area where the hospital's security cameras would not capture it. This is consistent with what CW-1 told law enforcement, discussed above, which was that W██████ told him/her that IRVIN delivered the affidavit to W███████ in the hospital.

40.     Later the same day, JACKSON and G. JACKSON (GREG)[9] appeared to discuss the fact that IRVIN had picked up the affidavit from JACKSON's defense attorney's office:[10]

---

[9] The phone number 513-545-0214 is saved in BROWN's phone under the name "Greg."
[10] This particular call was placed under JACKSON's PIN.

| Date | Dialed # | Content |
|------|----------|---------|
| 10/30/19<br><br>5:16<br>p.m. | 513-545-0214<br><br>(G. JACKSON) | **GREG:** So uh he, he picked it up from [Jackson's defense attorney] today. Couldn't take it over there today because uh homeboy's brother was at work. They're gonna meet first thing in the morning.<br><br>**JACKSON:** Okay…. oh okay… that's what's up<br><br>**GREG:** Yeah<br><br>**JACKSON:** You still at mama's?<br><br>**GREG:** Nah, I'm at the house |

41.     Less than an hour later, JACKSON used another inmate's PIN to call G. JACKSON (GREG) back. They again appeared to discuss paying off W███████ at the hospital:

| Date | Dialed # | Content |
|------|----------|---------|
| 10/30/19<br><br>6:03<br>p.m. | 513-545-0214<br><br>(G. JACKSON) | **JACKSON:** Where you at? Mama's house?<br><br>**GREG:** Nah, at home.<br><br>**JACKSON:** OK.<br><br>[. . .]<br><br>**GREG:** Tomorrow'll be another morning. [U/I] got some good news, when you be calling around tomorrow.<br><br>**JACKSON:** Did you holla at [U/I] and tell him what I said for that --<br><br>**GREG:** Yeah –<br><br>**JACKSON:** -- the blind spot and all that?<br><br>**GREG:** Yeah<br><br>**JACKSON:** Make sure it ain't no wham-bam, "That ain't mine, uh!" |

|  |  | **GREG:** Right, yeah – he already know it, he already know it. |
|  |  | **JACKSON:** Yeah. |
|  |  | **GREG:** Yep. |
|  |  | **JACKSON:** Yeah, [U/I] out of here. Nope. Everything should be cool by tomorrow – nah – He don't know when [Jackson's defense attorney] gonna be able to get with my PO, though |
|  |  | **GREG:** Nah, but see, that's what I wanted him to do. Before you give it to [Jackson's defense attorney], go make a copy, and we can go fax the dude ourselves. You know, I know it'll be better coming from him; I just don't want to wait on her. Don't want to look like nothing made-up or nothing. |
|  |  | **JACKSON:** I wonder… I wonder what's the procedure with that, though. |
|  |  | **GREG:** Yeah, you might to just still have a hearing there, and that's what I said. You might have to just pay the bond anyway, to get you transferred after that. |
|  |  | **JACKSON:** Yeah |
|  |  | . . . |
|  |  | **GREG:** But then again, [Jackson's defense attorney] might not want that. |
|  |  | **JACKSON:** Yeah, that's what I was saying. Yeah because I know she ain't trying to lie all the way up there – |
|  |  | **GREG:** Yeah, she don't want no part for them. |
|  |  | **JACKSON:** Yeah, that's where I'm at with it. But if it's gonna guarantee out there, then shit. If she — |

| | | **GREG:** Yeah, like [redacted][11] said, the probation officer said, um, he took the situation to his supervisor, so his supervisor making the decision right now, but ultimate the decision to lift the holder is up to him.<br><br>. . . .<br><br>**JACKSON:** Brother didn't say what time tomorrow, huh?<br><br>**GREG:** Nah, he just said tomorrow morning, because he gotta do it before he go to work, they go to work. |
|---|---|---|

42.     Later the same night, JACKSON called BROWN using another inmate's PIN, and the two discussed their finances, including finding money to pay off bills and giving money to JACKSON's brother. Based on context, including other calls I describe below, I believe JACKSON was instructing BROWN to gather money to give to G. JACKSON (GREG), which G. JACKSON would then give to W████████:

| Date | Dialed # | Content |
|---|---|---|
| 10/30/19<br><br>7:54 p.m. | 513-212-5895 (BROWN) | **JACKSON:** Trying to think how I want to do this. Is it 10, 11 – like – nothing extra? Like, you got some in your purse? You cool?<br><br>**BROWN**: Yeah. I been working every day. [U/I]<br><br>**JACKSON**: What I'm saying, 'cuz . . .  what bills need to be, what bills due?<br><br>**BROWN**: [U/I] |

---

[11] G. JACKSON used the first name of a woman here. Because this woman is not presently a subject of the criminal investigation, I have redacted it to protect her privacy.

| | | JACKSON: That's on the 18th. |
| | | BROWN: Oh, ok. [U/I] |
| | | JACKSON: Then it's time for Boost Mobile, too. |
| | | BROWN: That's like 30. |
| | | JACKSON: Nah, my mama's 26, Jearid 26, and then – |
| | | BROWN: I already paid that. With the ten dollars off. |
| | | JACKSON: Ah, well. Ain't nothing coming up – |
| | | . . . . |
| | | JACKSON: So look, take that ten, right, and give it to my brother. |
| | | BROWN: Uh huh. |
| | | JACKSON: Or, you can - uh, yeah, give it to my brother and tell him I said, "[U/I] cuz, use that for [U/I]" |
| | | BROWN: Okay. |
| | | JACKSON: You hear me? |
| | | BROWN: Uh huh. |
| | | JACKSON: And then whatever you making off the other cases of CDs that you got, you just put that toward the bills and stuff like that. |

43. Because of the evidence that G. JACKSON and IRVIN paid off W▇▇▇▇ on October 31, 2019 (including additional calls I describe below), I believe that on this call from October 30, 2019 when JACKSON told BROWN to give "ten" to his "brother," he meant that BROWN should give $10,000 to G. JACKSON.

27

44. The next morning, on October 31, 2019, G. JACKSON appeared to tell JACKSON that the affidavit had been signed. Based on context, I believe that, in the excerpt below from a jail call JACKSON placed using another inmate's PIN, the two were discussing how W▇▇▇▇▇ wanted both payments now, not just the first payment; JACKSON considered this to be "extortion":

| Date | Dialed # | Content |
|------|----------|---------|
| 10/31/19<br><br>2:07 p.m. | 513-545-0214 (G. JACKSON) | **JACKSON**: Hello, bra.<br><br>**GREG**: What up<br><br>**JACKSON**: What's going on?<br><br>**GREG**: Nothing. Everything got done. [Jackson's defense attorney] got the paperwork but, see I told him what it was gonna be. You know what I mean?<br><br>**JACKSON**: What's that?<br><br>**GREG**: Now it's something else. You know what I'm saying?<br><br>**JACKSON**: Huh?<br><br>**GREG**: I don't know, man. Just --<br><br>**JACKSON**: I know, uh –<br><br>**GREG**: They didn't say that, they said this. You know what I'm saying, like?<br><br>**JACKSON**: uh – I don't under – I don't. I mean, [Jackson's defense attorney] just left from seeing me too.<br><br>**GREG**: what'd she say?<br><br>**JACKSON**: She wasn't saying nothing. She was just saying whenever she gets the paper, she can give it to my PO and see how that works, see if they can lift the holder.<br><br>**GREG**: Yeah, she got it now. The secretary got it for her. |

JACKSON: You can call her and let her know . . .she was saying she gonna try to see if they can lift the holder and I can get a bond or whatever. She was saying I might have to sit here until February or something like that. She's saying if they lift the holder or whatever we can go to a bail bondsman or some shit.

. . . .

JACKSON: Jessica will be here at 4. So I guess you can let her know if you need her to tell me something, she'll tell me.

. . . .

JACKSON: So basically they was trying to say that wasn't that right there?

GREG: Right! And he said, he, [redacted][12] said he said, "Then why would I have that, if that wasn't what it was? Why wouldn't I have anything else?"

JACKSON: Right. Like I said, they went on and did it, though, huh?

GREG: Yeah, he gave him his word, you know…if the, the other one.

JACKSON: Oh, when it's, when it's over with?

GREG: Nah, he was saying *before*, like.

JACKSON: Nah, that's trippin'.

GREG: Yeah. Like.

JACKSON: He trippin'.

GREG: Yeah, like… he in control of the situation out there. I mean, if that's how you want to feel, you know what I'm saying?

---

[12] G. JACKSON (GREG) used a nickname here. I have redacted the nickname because this individual is not presently a subject of this criminal investigation.

29

| | | **JACKSON**: [U/I] |
|---|---|---|
| | | **GREG:** That just means nobody learn nothing, man, it's just like. |
| | | **JACKSON**: Yeah. |
| | | **GREG:** Unfortunate situation. |
| | | **JACKSON**: They're fuckin' extortin', you know what I mean. Trying to extort a motherfucker. They trippin' |
| | | **GREG:** Yeah. |
| | | **JACKSON**: The brother crossed his T's and dotted his I's, though? |
| | | **GREG:** He did. Yeah. |
| | | **JACKSON**: They trippin', man. I don't know, man. I guess when Jessica get here I'll be able to talk to her. |

45.  When G.JACKSON (GREG) said, "Yeah, he gave him his word, you know…if the, the other one," and JACKSON responded, "Oh, when it's, when it's over with?", I believe they were talking about the second payoff payment. When GREG responded, "Nah, he was saying *before*, like," he meant that W████████ wanted the second payment before JACKSON's case was finished.

46.  Several weeks later, on November 14, 2019, JACKSON called G. JACKSON using another inmate's PIN to discuss his legal strategy and his new defense attorney, whom he had just retained after his previous defense attorney passed away:

30

| Date | Dialed # | Content |
|------|----------|---------|
| 11/14/19<br><br>11:08<br>a.m. | 513-545-0214<br>(G. JACKSON) | **JACKSON**: [Jackson's new defense attorney] said he gonna file a motion to suppress identity, he's gonna do that ASAP.<br><br>**GREG**: Did you tell him about the signed affidavit?<br><br>**JACKSON**: Yeah, yep, I told him about that, and he said he'd need a copy of that and all that stuff. |

47.  JACKSON's new defense attorney subsequently filed a copy of W█████████'s affidavit as part of a motion to dismiss/motion to suppress the identification.

**J.  W█████████ has attempted to evade law enforcement and to avoid testifying in this matter, suggesting the scheme is ongoing.**

48.  As noted above, BROWN and W█████████ were communicating as recently as October 2020—mere days before BROWN's phone was seized—about what appears to be a scheme in which JACKSON, BROWN, IRVIN, and G. JACKSON paid W█████████ to recant his identification of JACKSON as the shooter.

49.  The federal case against JACKSON remains pending, with a trial currently set for March 22, 2021. Law enforcement agents have been unable to serve W█████████ with a subpoena to testify at trial, in part because W█████████ previously provided law enforcement with a fake phone number. Additionally, the texts set out above lead me to believe that W█████████ is still awaiting another $8,000 payment from the coconspirators. I believe, based on these facts and others described above, that the scheme is ongoing and that W█████████ still intends to avoid testifying against JACKSON or to testify

falsely that JACKSON was not the shooter. Because the scheme is likely ongoing, and because

W███████ may receive another payment from the coconspirators (which, in my training and

experience, is unlikely to be an electronic payment, which is traceable), I further believe that

W███████ is likely still in contact with BROWN, G. JACKSON, IRVIN, and other coconspirators and

that the suspects are likely meeting in person in connection with the scheme. Because W███████

remains largely incapacitated as a result of the injuries he sustained when JACKSON shot him, I further

believe it is likely that the coconspirators, including IRVIN, are coming to W███████ in order to meet

to facilitate the scheme. I also believe it is likely that IRVIN, G. JACKSON, BROWN, and/or other

conspirators are procuring the money to pay off W███████ in cash,[13] and, because W███████ is

incapacitated, that IRVIN, G. JACKSON, BROWN, and/or other coconspirators likely delivered the

cash directly to W███████. Based on my training and experience, a person who receives money

illicitly is likely to keep the cash close by, and is unlikely to deposit the cash in a bank or other record-

keeping financial institution.

---

[13] As noted above, based on my training and experience, and my knowledge of the investigation to date, I do not believe it is likely that G. JACKSON or IRVIN would attempt to withdraw large amounts of cash (such as $8,000.00) from any traceable source, such as a bank or loan company. I also know, based on my review of G. JACKSON's criminal history, that he has prior felony convictions for forgery and tampering with records, which indicates to me that he may have knowledge of illicit ways to procure funds, and/or may have contact with those who do.

**K.** **Records received pursuant to search warrants suggest that W█████ is presently using the cell phone assigned call number ████-5741.**

50.     On February 3, 2021, the University of Cincinnati Medical Center provided information to the U.S. Attorney's Office for the Southern District of Ohio pursuant to a search warrant.[14] This information included W██████'s current home phone number, as recorded in hospital records, which is also listed as his cell phone number: ████-5741. The records indicated that W█████ is receiving ongoing treatment at the hospital and has upcoming appointments, and that this is the phone number the hospital uses to contact W██████ regarding those appointments.

51.     I know, based on my training and experience, that modern cell phones serve many functions, such as "wallets," and contain a vast amount of highly personal data, such as web history, text messages, call logs, photographs, and other materials. Therefore, individuals typically carry cell phones with them at all times, or keep them secured nearby. I believe it is highly likely that W██████ carries any cell phones he has on his person or in bags or objects closely associated with his person.  Law enforcement databases show that the cell phone assigned call number ████-5741 is registered to an "A████ I███." "A█████" is W██████'s first name. Moreover, I know, based on my familiarity with W██████'s family, that W██████ has relatives with the surname "I███."

---

[14] The Honorable U.S. Magistrate Judge Karen L. Litkovitz signed warrant 1:21-MJ-113 on February 3, 2021.

33

52.     A search warrant for prospective cell site data for the cell phone assigned call number ███-5741[15] yielded data showing that the cell phone has been at various places overnight, leading me to believe that W█████ may not have a permanent address. I have reviewed location data regarding the cell phone assigned call number ███-5741 as recently as February 23, 2021. This cell phone has remained in the Southern District of Ohio since I first began receiving location information.

53.     **Objects found on W█████'s person, including any cell phones or electronic storage media, likely contain evidence relevant to this case.**

54.     As discussed above, I believe that W█████ currently uses the cell phone assigned call number ████5741. I also believe that W█████ used a cell phone assigned call number ████ 5005 as recently as October 2020 to communicate with BROWN and G. JACKSON regarding the scheme to pay W█████ in exchange for his recantation. Because the scheme is ongoing—W█████ is still awaiting the second half of the payoff—I believe that any cell phone he currently uses and/or possesses may contain evidence relating to the conspiracy. Specifically, I believe that BROWN, G. JACKSON, IRVIN, and/or other conspirators are in contact with W█████ by phone to facilitate paying W█████ money in exchange for his signed recantation.

55.     I know, based on my training and experience, that modern cell phones serve many functions, such as "wallets," and contain a vast amount of highly personal data, such as web history, text messages, call logs, photographs, and other materials. Therefore, individuals typically carry cell phones

---

[15] The Honorable U.S. Magistrate Judge Karen L. Litkovitz signed warrant 1:21-MJ-115 on February 4, 2021.

with them at all times, or keep them secured nearby. For this reason, I believe that W████████ likely keeps his cell phone(s) on his person or nearby.

56.      I also know, based on my training and experience, that it is common for inmates to send letters to those outside the jail because the contents of those letters are not monitored, whereas inmates are explicitly told that their phone calls are being recorded. For this reason, inmates often include more explicit information relating to their criminal activity in letters that they would not reveal over the phone. Because I know that people may keep personal letters on their person or in bags or objects closely associated with their person, particularly when they do not have a permanent or stable address where they can store such letters, I believe that W██████ may have letters from JACKSON on his person or in bags or other containers closely associated with his person.

57.      I also believe that any cash W██████ has on his person may be evidence of the payoff, particularly if it is over $1,000. Based on my training and experience, W█████ is unlikely to put illicitly received money in a financial institution, where there would be a paper trail. Because W██████ does not appear to have a stable address, I believe it is likely that W███████ keeps any cash on his person or in bags or objects closely associated with his person. I know, based on his medical records and my past observations of his physical condition, that it is highly unlikely that W███████ is currently employed based on the extent of his injuries and on-going medical care. Therefore, I believe

35

that any cash on W███████'s person is likely from the payoff W███████ received from IRVIN and G. JACKSON.

## TECHNICAL TERMS

58.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> a.   Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, cell phones, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

59.     As described above and in Attachment B, this application seeks permission to search for records that might be found on W███████, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media, such as cell phones.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

60.     *Probable cause.*  I submit that if a computer or storage medium is found on W███████, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

36

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence,

37

because special software is typically required for that task. However, it is technically possible to delete this information.

    d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

61.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium on W████ because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file

systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks

and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

40

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

62. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a person for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from W███████, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to

41

ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on W██████. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

42

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

63. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

64. I submit that this affidavit supports probable cause for a warrant to search W███████, as described in Attachment A, and seize the items described in Attachment B.

## REQUEST FOR SEALING

65. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this

investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

EDWARD SCHAUB
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me on _____ Feb. 24 _____, 2021.

Karen L. Litkovitz
United States Magistrate Judge

44

## ATTACHMENT A

*Premises to be searched*



The premises to be searched is the person of A█████ W███████, further described as a

Black male born on █████████ 1989, with Social Security Number X███████ The premises

to be searched also includes any clothing W██████ is wearing at the time of the search, as well as any

bags or containers on W████████'s person or within his reach at the time of the search.


This warrant authorizes a search of W███████ only within the Southern District of Ohio.

45

**ATTACHMENT B**

*Property to be seized*

All records relating to violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm or ammunition); 18 U.S.C. § 1623(a) (perjury); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. §§ 371 and 1503 (conspiracy to commit obstruction of justice); 18 U.S.C. § 1512(b)(2) (witness tampering); 18 U.S.C. § 1512(c)(2) (witness tampering); and 18 U.S.C. § 1512(k) (conspiracy to commit witness tampering), those violations involving Darias JACKSON, Jessica BROWN, Gregory JACKSON, Jearid IRVIN, and other conspirators and occurring on or about September 19, 2019, through the present, specifically:

    a.   All communications and records, in whatever form they may be—whether they are paper communications such as letters, audio recordings, electronic communications, or otherwise:

        i.   that contain evidence of Darias JACKSON, Jessica BROWN, Gregory JACKSON, and/or Jearid IRVIN endeavoring to influence, obstruct, evade, impede, or otherwise interfere with the investigation into Darias JACKSON's role in the shooting of A███ W██████ on September 19, 2019;

        ii.   that contain evidence of Darias JACKSON, Jessica BROWN, Gregory JACKSON, and/or Jearid IRVIN engaged in a conspiracy to pay, influence, persuade, bribe, threaten, or otherwise communicate with

A█████ W███████ for the purpose of getting A█████ W███████ to recant his identification of JACKSON as the person who shot him on September 19, 2019, or to otherwise not cooperate in criminal prosecutions and investigations;

iii. relating to the shooting of A█████ W███████ on or about September 19, 2019, near Groesbeck Road in Cincinnati, Ohio, including any communications relating to the incident;

iv. relating to the possession of a firearm and ammunition by Darias JACKSON;

v. relating to communications between A█████ W███████ and Darias JACKSON, including, but not limited to, communications related to the September 19, 2019 shooting of A█████ W███████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A█████ W███████ and possessing firearms and/or ammunition;

vi. relating to communications between A█████ W███████ and Jearid IRVIN, including, but not limited to, communications related to the September 19, 2019 shooting of A█████ W███████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias

2

JACKSON's role in the shooting of A███ W██████ and possessing firearms and/or ammunition;

vii.  relating to communications between A███ W██████ and Gregory JACKSON, including, but not limited to, communications related to the September 19, 2019 shooting of A███ W██████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A███ W██████ and possessing firearms and/or ammunition;

viii.  relating to communications between A███ W██████ and Jessica BROWN, including, but not limited to, communications related to the September 19, 2019 shooting of A███ W█████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A███ W██████ and possessing firearms and/or ammunition;

ix.  relating to communications to or from A███ W█████ and other third parties related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A███ W██████ and possessing firearms and/or ammunition;

x.  regarding money used to facilitate a payoff to A███ W██████;

3

b. U.S. currency ($1,000.00 or more) that is indicative of proceeds from the payoff in exchange for W███████'s recantation.

c. All cellphones, mobile phones, smartphones, and tablets (such as iPads) belonging to or used by A████ W██████ (hereafter, any "Phone"), including but not limited to the Phones assigned call numbers ██████5741 and ██████ 5005;

d. For any computer or storage medium, including any cell phones and tablets, whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

  i. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

  ii. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

  iii. evidence of the lack of such malicious software;

4

    iv.   evidence indicating how and when the computer was accessed or used to

              determine the chronological context of computer access, use, and events

              relating to crime under investigation and to the computer user;

    v.   evidence indicating the computer user's state of mind as it relates to the

              crime under investigation;

    vi.   evidence of the attachment to the COMPUTER of other storage devices or

              similar containers for electronic evidence;

    vii.   evidence of counter-forensic programs (and associated data) that are

              designed to eliminate data from the COMPUTER;

   viii.   evidence of the times the COMPUTER was used;

    ix.   passwords, encryption keys, and other access devices that may be

              necessary to access the COMPUTER;

    x.   documentation and manuals that may be necessary to access the

              COMPUTER or to conduct a forensic examination of the COMPUTER;

    xi.   records of or information about Internet Protocol addresses used by the

              COMPUTER;

    xii.   records of or information about the COMPUTER's Internet activity,

              including firewall logs, caches, browser history and cookies,

"bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xiii.  contextual information necessary to understand the evidence described in this attachment.

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original      ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| The Person of A▇▇▇▇ W▇▇▇▇, DOB: 11/XX/1989, SSN: XXX-XX-3516, Including Any Bags or Objects Closely Associated with Him | ) ) ) ) |

Case No.  1:21-mj-174

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Southern_____ District of _____Ohio_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____3/10/2021_____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Karen L. Litkovitz_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   **1:34 PM, Feb 24, 2021** _____

Karen L. Litkovitz
**Karen L. Litkovitz**
**United States Magistrate Judge**

City and state:   Cincinnati, Ohio _____

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name(s) of any person(s) seized: |
|---|
| |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A</u>

*Premises to be searched*

The premises to be searched is the person of A████ W██████, further described as a
Black male born on November XX, 1989, with Social Security Number XX-XXX-3516. The premises
to be searched also includes any clothing W█████ is wearing at the time of the search, as well as any
bags or containers on W██████'s person or within his reach at the time of the search.

This warrant authorizes a search of W██████ only within the Southern District of Ohio.

**ATTACHMENT B**

*Property to be seized*

All records relating to violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm or ammunition); 18 U.S.C. § 1623(a) (perjury); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. §§ 371 and 1503 (conspiracy to commit obstruction of justice); 18 U.S.C. § 1512(b)(2) (witness tampering); 18 U.S.C. § 1512(c)(2) (witness tampering); and 18 U.S.C. § 1512(k) (conspiracy to commit witness tampering), those violations involving Darias JACKSON, Jessica BROWN, Gregory JACKSON, Jearid IRVIN, and other conspirators and occurring on or about September 19, 2019, through the present, specifically:

    a.   All communications and records, in whatever form they may be—whether they are paper communications such as letters, audio recordings, electronic communications, or otherwise:

        i.   that contain evidence of Darias JACKSON, Jessica BROWN, Gregory JACKSON, and/or Jearid IRVIN endeavoring to influence, obstruct, evade, impede, or otherwise interfere with the investigation into Darias JACKSON's role in the shooting of A█████ W███████ on September 19, 2019;

       ii.   that contain evidence of Darias JACKSON, Jessica BROWN, Gregory JACKSON, and/or Jearid IRVIN engaged in a conspiracy to pay, influence, persuade, bribe, threaten, or otherwise communicate with

A███ W██████ for the purpose of getting A█████ W██████ to recant his identification of JACKSON as the person who shot him on September 19, 2019, or to otherwise not cooperate in criminal prosecutions and investigations;

iii.   relating to the shooting of A█████ W██████ on or about September 19, 2019, near Groesbeck Road in Cincinnati, Ohio, including any communications relating to the incident;

iv.   relating to the possession of a firearm and ammunition by Darias JACKSON;

v.   relating to communications between A█████ W██████ and Darias JACKSON, including, but  not limited to, communications related to the September 19, 2019 shooting of A█████ W██████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A█████ W██████ and possessing firearms and/or ammunition;

vi.   relating to communications between A█████ W██████ and Jearid IRVIN, including, but  not limited to, communications related to the September 19, 2019 shooting of A█████ W██████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias

2

JACKSON's role in the shooting of A█████ W███████ and possessing firearms and/or ammunition;

vii.  relating to communications between A█████ W███████ and Gregory JACKSON, including, but not limited to, communications related to the September 19, 2019 shooting of A█████ W███████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A█████ W██████ and possessing firearms and/or ammunition;

viii.  relating to communications between A█████ W██████ and Jessica BROWN, including, but not limited to, communications related to the September 19, 2019 shooting of A█████ W█████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A█████ W██████ and possessing firearms and/or ammunition;

ix.  relating to communications to or from A█████ W██████ and other third parties related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A████ W██████ and possessing firearms and/or ammunition;

x.  regarding money used to facilitate a payoff to A████ W██████;

3

b.  U.S. currency ($1,000.00 or more) that is indicative of proceeds from the payoff in exchange for W█████████'s recantation.

c.  All cellphones, mobile phones, smartphones, and tablets (such as iPads) belonging to or used by A█████ W█████████ (hereafter, any "Phone"), including but not limited to the Phones assigned call numbers ████████-5741 and █████████ 5005;

d.  For any computer or storage medium, including any cell phones and tablets, whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    i.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    ii.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii.  evidence of the lack of such malicious software;

4

    iv.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    v.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

    vi.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    vii.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    viii.   evidence of the times the COMPUTER was used;

    ix.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    x.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    xi.   records of or information about Internet Protocol addresses used by the COMPUTER;

    xii.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies,

5

"bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xiii. contextual information necessary to understand the evidence described in this attachment.

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  1:21-mj-174 |
| The Person of A███████ W███████, DOB: 11/XX/1989, SSN: XXX-XX-3516, Including Any Bags or Objects Closely Associated with Him | ) ) ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:  Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Southern_____ District of _____Ohio_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____3/10/2021_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Karen L. Litkovitz_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  **1:34 PM, Feb 24, 2021**

City and state:  Cincinnati, Ohio

*Karen L. Litkovitz*
**Karen L. Litkovitz**
**United States Magistrate Judge**

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>773010-20-0064 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized:<br><br>*DID NOT EXECUTE/ERS 2/26/21* | | |

| Certification |
|---|
|     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br>Date: 2/26/21<br><br>_____<br>*Executing officer's signature*<br><br>ED SCHAUB ATF SA.<br>*Printed name and title* |

## ATTACHMENT A

*Premises to be searched*

The premises to be searched is the person of A████████ W████████ further described as a Black male born on November XX, 1989, with Social Security Number XX-XXX-3516. The premises to be searched also includes any clothing W████████ is wearing at the time of the search, as well as any bags or containers on W████████ person or within his reach at the time of the search.

This warrant authorizes a search of W████████ only within the Southern District of Ohio.

## ATTACHMENT B

*Property to be seized*

All records relating to violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm or ammunition); 18 U.S.C. § 1623(a) (perjury); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. §§ 371 and 1503 (conspiracy to commit obstruction of justice); 18 U.S.C. § 1512(b)(2) (witness tampering); 18 U.S.C. § 1512(c)(2) (witness tampering); and 18 U.S.C. § 1512(k) (conspiracy to commit witness tampering), those violations involving Darias JACKSON, Jessica BROWN, Gregory JACKSON, Jearid IRVIN, and other conspirators and occurring on or about September 19, 2019, through the present, specifically:

a. All communications and records, in whatever form they may be—whether they are paper communications such as letters, audio recordings, electronic communications, or otherwise:

  i. that contain evidence of Darias JACKSON, Jessica BROWN, Gregory JACKSON, and/or Jearid IRVIN endeavoring to influence, obstruct, evade, impede, or otherwise interfere with the investigation into Darias JACKSON's role in the shooting of A███ W██████ on September 19, 2019;

  ii. that contain evidence of Darias JACKSON, Jessica BROWN, Gregory JACKSON, and/or Jearid IRVIN engaged in a conspiracy to pay, influence, persuade, bribe, threaten, or otherwise communicate with

 ██ W ████ for the purpose of getting A ████ W ████ to recant his identification of JACKSON as the person who shot him on September 19, 2019, or to otherwise not cooperate in criminal prosecutions and investigations;

iii. relating to the shooting of A ████ W ████ on or about September 19, 2019, near Groesbeck Road in Cincinnati, Ohio, including any communications relating to the incident;

iv. relating to the possession of a firearm and ammunition by Darias JACKSON;

v. relating to communications between A ████ W ████ and Darias JACKSON, including, but not limited to, communications related to the September 19, 2019 shooting of A ████ W ████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A ████ W ████ and possessing firearms and/or ammunition;

vi. relating to communications between A ████ W ████ and Jearid IRVIN, including, but not limited to, communications related to the September 19, 2019 shooting of A ████ W ████ and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias

JACKSON's role in the shooting of A█████ W██████ and possessing firearms and/or ammunition;

vii. relating to communications between A█████ W██████ and Gregory JACKSON, including, but not limited to, communications related to the September 19, 2019 shooting of A█████ W█████, and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A█████ W██████ and possessing firearms and/or ammunition;

viii. relating to communications between A█████ W██████ and Jessica BROWN, including, but not limited to, communications related to the September 19, 2019 shooting of A█████ W█████ and communications related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A█████ W██████ and possessing firearms and/or ammunition;

ix. relating to communications to or from A█████ W██████ and other third parties related to obstructing, impeding, interfering, or influencing the investigation and judicial proceedings regarding Darias JACKSON's role in the shooting of A█████ W██████ and possessing firearms and/or ammunition;

x. regarding money used to facilitate a payoff to A█████ W██████

3

b. U.S. currency ($1,000.00 or more) that is indicative of proceeds from the payoff in exchange for ███████ recantation.

c. All cellphones, mobile phones, smartphones, and tablets (such as iPads) belonging to or used by A███ W████ (hereafter, any "Phone"), including but not limited to the Phones assigned call numbers ████5741 and ██████ 5005;

d. For any computer or storage medium, including any cell phones and tablets, whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    i. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    ii. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii. evidence of the lack of such malicious software;

4

iv.  evidence indicating how and when the computer was accessed or used to
determine the chronological context of computer access, use, and events
relating to crime under investigation and to the computer user;

v.  evidence indicating the computer user's state of mind as it relates to the
crime under investigation;

vi.  evidence of the attachment to the COMPUTER of other storage devices or
similar containers for electronic evidence;

vii.  evidence of counter-forensic programs (and associated data) that are
designed to eliminate data from the COMPUTER;

viii.  evidence of the times the COMPUTER was used;

ix.  passwords, encryption keys, and other access devices that may be
necessary to access the COMPUTER;

x.  documentation and manuals that may be necessary to access the
COMPUTER or to conduct a forensic examination of the COMPUTER;

xi.  records of or information about Internet Protocol addresses used by the
COMPUTER;

xii.  records of or information about the COMPUTER's Internet activity,
including firewall logs, caches, browser history and cookies,

5

"bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xiii.   contextual information necessary to understand the evidence described in this attachment.